**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITES AND EXCHANGE COMMISSION,** : | **No. 15-CV-02304 (DLC)** |
| : | |
| **Plaintiff,** : | |
| **v.** : | |
| : | |
| **MACQUARIE CAPITAL (USA) ET AL.,** : | |
| : | |
| : | |
| **Defendants.** : | |
| : | |

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR AN ORDER APPROVING THE FINAL ACCOUNTING, REMITTING FUNDS TO THE U.S. TREASURY, TERMINATING THE FAIR FUND, DISCHARGING THE DISTRIBUTION AGENT, AND RELATED RELIEF

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") respectfully submits this memorandum in support of its Motion for an Order Approving the Final Accounting, Remitting Funds to the U.S. Treasury; Terminating the Fair Fund, Discharging the Distribution Agent, and Related Relief (the "Motion"). This Memorandum of Law includes the Declaration of Melissa Mejia in Support of this motion (the "Declaration"), attached as Exhibit A, and the Consolidated Final Accounting Report ("CFAR"), prepared by the Distribution Agent and Tax Administrator, attached as Exhibit B.

### I.    FACTUAL BACKGROUND

On March 27, 2015, the Commission filed a complaint against Macquarie Capital (USA) Inc. ("Macquarie"), and two investment bankers formerly affiliated with Macquarie[1] (collectively, "Defendants"), alleging that Defendants proceeded to underwrite and market a $108 million follow-on ("Secondary") public offering by Puda Coal, Inc. ("Puda"), despite due

---

[1] Aaron Black ("Black") and William Fang ("Fang").

diligence efforts that uncovered the fact that Puda no longer owned a Chinese coal company, Puda's principal asset and sole source of revenue.  The Commission alleged that the Defendants' conduct violated Sections l7(a)(2) and 17(a)(3) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

On April 1, 2015, the Defendants consented to Final Judgments and were permanently restrained and enjoined from violating Sections l7(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].  Defendant Macquarie was ordered to pay to the Commission a total of $12 million in disgorgement and prejudgment interest, consisting of $10,728,525 in disgorgement and $1,271,475 in prejudgment interest thereon, and a civil penalty in the amount of $3,000,000 pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]. Defendant Macquarie was further ordered to pay all costs incurred under any plan for distribution of the disgorgement and civil penalty, including but not limited to any taxes owed by the fund, and all fees and expenses of any Court-appointed distribution agent,  tax administrator, and/or experts retained ("Final Judgment").[2]  On or about April 1, 2015, $15 million was paid to the Commission and deposited into an interest-bearing account with the Bureau of Fiscal Service.

On August 12, 2015, the Court issued an Order  establishing a Fair Fund ("Fair Fund"), pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002 for the funds deposited with the SEC under the case name designation "SEC v. Macquarie Capital (USA) Inc., et al.", plus

---

[2] Defendant Black was ordered to pay $97,500 in disgorgement and prejudgment interest in the amount of $13,211, and a civil penalty in the amount of $100,000 to the Commission; and Defendant Fang was ordered to pay a civil penalty in the amount of $35,000 to the Commission, both pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)].  The funds received from Black and Fang were designated to be paid to the Commission for transfer to the Treasury.

interest earned on those funds and appointed Damasco & Associates LLP ("Damasco")[3] as Tax Administrator to execute all income tax reporting requirements, including the preparation and filing of tax returns, with respect to the Fair Fund.  Dkt. No. 11.

On October 20, 2015, the Court appointed Epiq Class Action & Claims Solutions, Inc. ("Epiq") to serve as the Distribution Agent for the Fair Fund to assist in overseeing the administration and the distribution of the Fair Fund in coordination with the SEC staff. Dkt. No. 13.

On November 19, 2015, the Court approved a proposal that the Commission conduct a joint notice and claims solicitation with the Class Action, *In re Puda Coal Securities Inc., et al. Litigation,* Civil Action No. 11-cv-2598 (DLS) ("Class Action") to be administered by the same distribution agent appointed in this action.  Dkt. No. 18.  On February 19, 2016, the Court issued an Order approving a distribution plan ("Plan") for the Fair Fund.

## II.   DISTRIBUTION OF THE FAIR FUND

Under the Plan, investors who purchased Puda Coal common stock in the Secondary Offering and held the stock through at least April 7, 2011 and suffered an eligible loss, as calculated pursuant to the Plan of Allocation, were eligible for a distribution payment.

The Distribution Agent mailed a total of 44,740 Joint Notice of Funds and Proof of Claim Forms to Potentially Eligible Claimants[4] who may have been harmed by their investments in the Secondary Offering of Puda Coal common stock and purchases of Puda Coal

---

[3] As of October 1, 2016 Damasco & Associates LLP became a part of Miller Kaplan Arase LLP. The firm's engagement with the  SEC and its ability to carry out its duties as the appointed Tax Administrator for this case has not changed.

[4] All capitalized terms used herein but not defined shall have the same meanings ascribed to them in the Plan.

stock options.  The Distribution Agent received and processed a total of 3,018 claims submitted

by Potentially Eligible Claimants.  The Distribution Agent determined that 197 of the 3,018

were eligible for payment.[5]  *See* Exhibit A.

On May 4, 2017, the Court directed the Commission to transfer $4,371,360.77 from the

Fair Fund to the Distribution Agent for distribution to Eligible Claimants in accordance with the

Plan.  Dkt. No. 33.  The Distribution Agent subsequently disbursed the funds to Eligible

Claimants by check and wire transfers.

The Distribution Agent monitored the status of all checks issued and made extra efforts to

contact investors who had not negotiated payments in order to maximize the number of checks

cashed.  Among other things, the Distribution Agent contacted Eligible Claimants by phone to

encourage check negotiation and offered reissues of checks where appropriate.  The Distribution

Agent further researched new addresses for Eligible Claimants whose checks were returned as

undeliverable.  Ultimately, the Distribution Agent successfully distributed $4,370,160.77 to

Eligible Claimants, and $1,200 was not successfully distributed because payments were not

negotiated.  *See* Exhibit B.

## III.    FINAL ACCOUNTING REPORT

Distribution of all Fair Fund monies to Eligible Claimants has been completed. The

CFAR contained in Exhibit B has been prepared in accordance with Paragraph 4.3 of the Plan,

and has been submitted to the Commission staff.  The Commission staff has reviewed Exhibit B

and now submits it to the Court for approval.  The CFAR includes a final accounting of all

monies received, earned, spent and distributed in connection with the administration of the Plan.

---

[5]  The Distribution Agent determined 2,821 claims were ineligible to receive a payment because: (1) the claims did not calculate to an Eligible Loss Amount; (2) there were no eligible purchases in the Secondary Offering; (3) the claim was a duplicate of another claims; and/or (4) the claim was withdrawn by the submitter.

A total of $1,658.25 was paid from the Fair Fund in investment/bank fees.  There were no taxes

or Distribution Agent or Tax Administrator fees or expenses paid from the Fair Fund, because

these expenses were paid by the Defendant, pursuant to the Final Judgment.  The Distribution

Agent has returned the remaining funds to the Commission (Exhibit A, para. 7) and the Fair

Fund balance as of January 8, 2021 is $11,037,998.14.

The SEC staff has made a good faith effort to locate all harmed investors and to distribute

the Fair Fund to all Eligible Claimants.  Eligible Claimants harmed by the Defendants' conduct

alleged in the Complaint have been fully compensated.[6]  Accordingly, the SEC staff recommends

that in light of the facts and circumstances of this case, the $11,037,998.14 in residual funds left in

the Distribution Fund (the "Residual") and any funds returned to the Fair Fund in the future

should be transferred to the general fund of the U.S. Treasury ("Treasury") subject to Section

21F(g)(3) of the Exchange Act.[7]  The proposed disposition of the Residual is consistent with the

equitable principles of deterring wrongdoing and depriving the Defendants of illegally-obtained

profits.

The SEC staff submits that the transfer of the Residual to the Treasury is in the interest

of justice, and is consistent with the Supreme Court's decision in *Liu v. SEC*, 140 S. Ct. 1936

(2020).  Although equity "generally" requires the SEC to return a defendant's gains to wronged

investors for their benefit, the Supreme Court ruled that it is an "open question" whether

depositing disgorged funds with the Treasury is permissible when distribution of collected funds

to investors is "infeasible."  *Id.* at 1948; *see id.* at 1947 ("Because the parties focused on the

---

[6] All Eligible Claimants were fully compensated, with the exception of $1200 in payments that were not negotiated, despite the best efforts of the Distribution Agent.

[7] Section 21F(g)(3) of the Exchange Act, 15 U.S.C. § 78u-6(g)(3), provides in relevant part, that any monetary sanction of $200 million or less collected by the SEC in any judicial action brought by the SEC under the securities lases that is not added to a disgorgement fund or fair fund or otherwise distributed to victims, plus investment income, shall be deposited or credited into the SEC Investor Protection Fund.

broad question whether any form of disgorgement may be ordered and did not fully brief [the] narrower question[]" whether courts must always "return funds to victims," "*we do not decide [that] here*.") (emphasis added).  Accordingly, the Supreme Court expressly permitted lower courts to evaluate "in the first instance" whether an order depositing disgorgement funds with the Treasury in such circumstances would be "appropriate or necessary for the benefit of investors," 15 U.S.C. § 78u(d)(5), and consistent with "equitable principles."  *Id.* at 1949; *see also SEC v. Blackburn*, 15-cv-2451 at 6 (E.D. La. Nov. 3, 2020) ("[T]he Supreme Court did not create a rule requiring all disgorged funds be returned to investors or that a disgorgement award be limited to those funds that could be returned to investors."); *SEC v. Laura*, 18-cv-5075 at 8-9 (E.D.N.Y. Dec. 30, 2020) (similar).

Disbursing the Residual to the Treasury is consistent with *Liu*.  The order of disgorgement in this case was "for the benefit of investors" and consistent with equitable principles because it directed funds to be disbursed to investors and, as discussed, the SEC fully compensated Eligible Claimants to the extent possible and therefore, has made a complete distribution to injured investors.  *See SEC v. Rinfret*, 19-cv-6037 at 13 (S.D.N.Y. Nov. 9, 2020) ("Ordering this disgorgement is consistent with equitable principles, as it was fraudulently obtained from investors and the SEC has represented that it will use almost the entirety of these funds to compensate those same investors… As the SEC explains, 'each investor [would] receive a *pro rata* distribution payment' of the disgorged funds."); *SEC v. Curative Biosciences, Inc.*, 2020 WL 7345681, at 9 (C.D. Cal. Oct. 25, 2020) (*Liu* satisfied where "the SEC assert[ed] that it intends to distribute the funds to investors harmed by the Alversons' sale of unregistered securities").

It is consistent with *Liu* to distribute the Residual to the Treasury.  Disgorgement is a

"profit-based measure of unjust enrichment" that is measured by the defendant's "wrongful gain," rather than a victim's loss. *Liu*, 140 S. Ct. at 1943.  Thus, the successful distribution of disgorged funds in this case to injured investors does not entitle defendant to retain his ill-gotten gain.  *See SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993) ("[A] disgorgement order might be for an amount more or less than that required to make the victims whole.").

As to the question of how those funds should be disbursed, distribution to the Treasury serves the "foundational" principle of equity that no person should profit from his own wrong, while complying with the general requirement that disgorged funds be remitted to known victims. *Liu*, 140 S. Ct. at 1943, 1948.  In contrast, ordering the Residual to be remitted to the wrongdoer who never had a legitimate claim to that money would frustrate equity and would not be "for the benefit of investors" because it would reward conduct that the securities laws prohibit to protect investors.  Further, equity recognizes that if distribution to a victim is not feasible—here, because investors have been compensated—disgorged funds may be awarded to the *cy pres* (*i.e.*, nearest possible) alternative.  *Pearson v. Target Corp.*, 968 F.3d 827, 837 (7th Cir. 2020) (applying *Liu*). And, in the securities laws, "Congress made payment to the Treasury the cy pres alternative … to payment to victims of fraud when payment to the victims is infeasible."  *SEC v. Custable*, 796 F.3d 653, 656 (7th Cir. 2015). [8]

Paragraph 4.5 of the Plan provides that the Fair Fund shall be eligible for termination, and the Distribution Agent eligible for discharge, after all of the following have occurred:  (1) the final accounting has been submitted and approved by the Court, (2) all taxes and fees have

---

[8]  Recent amendments to the Exchange Act confirm courts' authority to order disgorgement of "*any* unjust enrichment by the person who received such unjust enrichment as a result of such violation."  Section 6501 of the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, to be codified at 15 U.S.C. § 78u(d)(3)(A)(ii) (emphasis added). The proposed distribution is consistent with these amendments to the extent they are relevant here.

been paid, and (3) all remaining funds have been paid to the Commission for transfer to the

Treasury.  Accordingly, the SEC respectfully requests that the Court: (1) approve the final

accounting included as Exhibit B to this Memorandum of Law; (2) direct the Commission to

transfer the residual funds remaining in the Fair Fund to the general fund of the U.S. Treasury

subject to Section 21F(g)(3) of the Exchange Act;[9] (3) direct any funds returned to the Fair Fund

in the future to the SEC for remittance to the general fund of the U.S. Treasury subject to Section

21F(g)(3) of the Exchange Act; (4) terminate the Fair Fund; and (5) discharge the Distribution

Agent.

## IV.  **CONCLUSION**

Wherefore, for all the foregoing reasons, the Commission respectfully requests that the

Court enter the proposed Order and grant such other relief as it deems just and proper.

Dated:  January 15, 2021                              Respectfully submitted,

 

_____

Nichola L. Timmons
Susan Pecaro
Kenneth J. Guido
Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-5876
Telephone:  (202) 551-4456 (Timmons)
             (202) 551-4489 (Pecaro)
             (202) 551-4480 (Guido)
Email: Timmonsn@sec.gov
          Pecaros@sec.gov
          Guidok@sec.gov

---

[9] Section 21F(g)(3) of the Exchange Act, 15 U.S.C. § 78u-6(g)(3), provides, in relevant part, that any monetary sanction of $200 million or less collected by the SEC in any judicial action brought by the SEC under the securities laws that is not added to a disgorgement fund or fair fund or otherwise distributed to victims plus investment income shall be deposited or credited into the SEC Investor Protection Fund.